## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

AMY UTEGG, Individually and as
Assignor to Pauline Kessler as
Assignee, and PAULINE KESSLER,
Individually,

      Plaintiffs,

      v.

STATE FARM FIRE & CASUALTY
CO.,

      Defendant.

CIVIL ACTION NO. 3:24-CV-02038

(SAPORITO, J.)

## MEMORANDUM

This case was initiated in the Court of Common Pleas of Wayne County by the filing of a complaint on October 15, 2024. (Doc. 1). The plaintiffs brought claims for breach of contract and statutory bad faith under 42 Pa. Cons. Stat. Ann. § 8371 against State Farm for State Farm's denial to defend and indemnify Amy Utegg in a previous action filed against Ms. Utegg in the Court of Common Pleas of Wayne County (the "underlying action"). (Doc. 1-1, at 13). This case was timely removed to this Court on November 23, 2024. (Doc. 1). On December 2, 2024, State Farm filed a motion to dismiss and/or strike the plaintiffs' complaint. (Doc. 4). On August 12, 2025, we granted State Farm's motion to dismiss

and dismissed the plaintiffs' complaint in its entirety. (Doc. 23). Nonetheless, we allowed the plaintiffs to file an amended complaint within twenty-one (21) days after entry of our Order. (*Id.*). On August 25, 2025, the plaintiffs filed their amended complaint. (Doc. 24). Now before the Court is State Farm's motion to dismiss the plaintiffs' amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 27). The motion has been briefed by the parties (Doc. 28; Doc. 33; Doc. 34; Doc. 35) and it is ripe for review.

## I.    Factual Background[1]

This action concerns two retired individuals, Paul Kessler and Pauline Kessler (the "Kesslers"). During their work years and while living in Pennsylvania, the Kesslers opened savings and retirement accounts with Burke Financial Group, a local Honesdale-based financial advisory firm. The Kesslers invested their savings in variable annuities sold by The Hartford.

The Kesslers were familiar with Bryan Utegg, an associate at Burke Financial Group. The Kesslers knew Bryan Utegg from his

---

[1] The facts are taken from the Kesslers' amended complaint in the underlying action. State Farm has attached that complaint (Doc. 27-2) to their motion to dismiss.

attendance at a local high school with one of the Kesslers' daughters. In 2006, Bryan Utegg informed the Kesslers that he was leaving his position with Burke Financial Group to start his own advisory and investment firm named Integrity Financial Services. Bryan Utegg's wife, Amy Utegg, served as the office manager of Integrity Financial Services. The Kesslers subsequently terminated their client relationship with the Burke Financial Group and commenced an exclusive client relationship with the Utegg's Integrity Financial Services firm.

In 2009, Bryan Utegg, in his capacity as Integrity Financial Services, sold the Kesslers a new variable annuity from The Hartford. In 2013, he also sold them two more variable annuities from The Hartford. At this point in time, the Kesslers owned a total of five annuities.

On December 27, 2013, Bryan Utegg advised the Kesslers that they should make significant withdrawals from their annuities to reinvest the money into new investments that Mr. Utegg represented would perform better than the annuities themselves. He informed the Kesslers that he would act on their behalf. The money from each annuity withdrawal was then deposited into the Kesslers' personal checking account. Bryan Utegg then advised the Kesslers to send him personal checks with the money

obtained from the withdrawals, in which he claimed he would use for better investments than the annuities. Mr. Utegg and Integrity Financial Services periodically provided the Kesslers with account summaries purporting to reflect the value and performance of the Kesslers' investments. Unbeknownst to the Kesslers, Bryan Utegg had not invested their money into retirement funds, but rather pocketed their money for his own personal gain through various entities.

## II.    The Underlying Action

At some point, the Kesslers learned about Bryan Utegg's actions for his personal gain and filed a complaint against him, along with additional responsible parties and entities, in the Court of Common Pleas of Wayne County for their losses stemming from the "cruel financial scheme." (Doc. 27-4, ¶ 1). The Kesslers alleged that they were sold annuities and deceptively induced into withdrawing funds from the annuities under the false pretense that "such payments constituted financial investments for the Kesslers' retirement nest egg." (*Id.*, ¶ 2). Pertinent to the current action before the Court, the Kesslers averred in the underlying action that the financial scheme was orchestrated by, among others, Ms. Amy Utegg, bringing claims of unjust enrichment, conversion, civil conspiracy,

fraud, negligence, and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law against Ms. Utegg for her overall role in the scheme.

At the time of the underlying action, Ms. Utegg held a Homeowners Policy ("Policy") with State Farm during the policy period June 12, 2013, through June 12, 2014. Generally, the Policy contained a provision that State Farm would provide a defense by counsel of its choice if a claim was brought against Ms. Utegg for bodily injury or property damage caused by an "occurrence." (Doc. 27-5, at 33). Ms. Utegg promptly sent the Kesslers' complaint against her to State Farm requesting indemnity and defense. State Farm, however, declined to enter and defend or indemnify Ms. Utegg after reviewing the complaint, claiming that the Kesslers' complaint failed to allege any bodily injury or property damage against them caused by an "occurrence" necessary to trigger coverage. (Doc. 27-2, at 70). Moreover, State Farm explained that the Policy also contained exclusions which precluded coverage to Ms. Utegg in the underlying action. (*Id.*) Specifically, it invoked the intentional acts, business pursuits, professional services, and contractual liabilities exclusions. (*Id.*, at 71). As a result, Ms. Utegg alleges that she had to secure her own

personal legal counsel to defend herself, incurring at least $15,000 in expenses.

On January 12, 2024, the Court of Common Pleas of Wayne County entered judgment against Ms. Utegg in the amount of $280,000 upon consideration of a motion for summary judgment filed by the Kesslers and with Ms. Utegg's withdrawal of opposition. (*Id.*, at 75). The Kesslers and Ms. Utegg subsequently entered into a settlement agreement, the terms of which included a $25,000 payment from Ms. Utegg to the Kesslers, an assignment of Ms. Utegg's interest under the State Farm Policy to the Kesslers, and a release of any additional claims against Ms. Utegg. (*Id.*, at 73).

## III.   The Current Action

On October 15, 2024, the plaintiffs, Ms. Utegg and Ms. Kessler, filed the current action against State Farm for claims of breach of contract and statutory bad faith under 42 Pa. Cons. Stat. Ann. § 8371 arising out of State Farm's determination that it did not owe a defense or indemnification to Ms. Utegg in connection with the underlying action. After our order dismissing the plaintiffs' complaint on August 12, 2025, the plaintiffs filed an amended complaint asserting those same claims.

(Doc. 24). The plaintiffs contend that State Farm owed Ms. Utegg a duty to defend her in the underlying action as required under the Policy, and that State Farm breached that contract when it refused to defend and indemnify her. Specifically, the plaintiffs aver that the negligence claim against Ms. Utegg in the underlying action constituted a claim of property damage caused by an "occurrence" that required a defense. Moreover, the plaintiffs contend that State Farm denied Ms. Utegg's request for coverage in bad faith because it refused to undertake any actions to determine whether defense or indemnity coverage existed.

### IV.    Legal Standard

State Farm has moved to dismiss the plaintiffs' complaint in its entirety. (Doc. 27). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

555–56 (2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).

## V.     Discussion

State Farm has moved to dismiss the plaintiffs' complaint on the same basis that it originally denied Ms. Utegg's request for defense and indemnification. State Farm contends that it owed Ms. Utegg no obligation to defend and indemnify her in the underlying action because the Kesslers' complaint against Ms. Utegg failed to allege any bodily injury or property damage caused by an "occurrence" necessary to trigger coverage. *See generally* (Doc. 27). Moreover, State Farm argues that the allegations contained in the Kesslers' complaint fall into Policy exclusions that preclude a defense or indemnification. (*Id.*). The relevant Policy

provisions are set out below.

A.    The Policy Coverage

Pertinent to this action, the Policy provided as follows:

COVERAGE L — PERSONAL LIABILITY

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence**, we will:

1.    pay up to our limit of liability for the damages for which the insured is legally liable; and

2.    provide a defense at our expense by counsel of our choice…

(Doc. 27-5, at 33). The Policy defines "occurrence" and "property damage" as follows:

7.    **"occurrence",** when used in Section II of this policy, means an accident including exposure to conditions which results in:

a.    **bodily injury**; or

b.    **property damage;**

8.    **"property damage"** means physical damage to or destruction of tangible property, including loss of use of this property. Theft or conversion of the property by an **insured** is not **property damage**.

(*Id.*, at 11). The Policy also includes the following exclusions:

SECTION II — EXCLUSIONS

- 9 -

1.      Coverage L and Coverage M do not apply to:

    a.      **bodily injury** or **property damage**:

        (1)    which is either expected or intended by the **insured**; or

        (2) which is the result of willful malicious acts of the **insured**;

    b.      **bodily injury** or **property damage** arising out of **business** pursuits of any **insured** or the rental or holding for rental of any part of any premises by any **insured**. This exclusion does not apply:

        (1) to activities which are ordinarily incident to non-**business** pursuits

    c.      **bodily injury** or **property damage** arising out of the rendering or failing to render professional services.

2.      Coverage L does not apply to:

    a.      liability

        (2) assumed under any unwritten agreement contract or agreement, or by contract or agreement in connection with a business of the **insured**;

(*Id.*, at 34–35).

## B.    Defense and/or Indemnification Standard

We next turn to the standard in which insurance providers owe insured individuals a defense under the Policy. The Third Circuit has

held:

> An insurer's duty to defend "is a distinct obligation" that is "different from and broader than the duty to indemnify." Because an insurer's duty to defend its insured in a lawsuit is broader than its duty to indemnify, it necessarily follows that it will not have a duty to indemnify an insured for a judgment in an action for which it was not required to provide a defense. Under Pennsylvania law, … a court ascertaining whether an insurer has a duty to defend its insured makes its determination by defining the scope of coverage under the insurance policy on which the insured relies and comparing the scope of coverage to the allegations of the underlying complaint. If the allegations of the underlying complaint potentially could support recovery under the policy, there will be coverage at least to the extent that the insurer has a duty to defend its insured in this case.
>
> As the Pennsylvania Supreme Court has explained, "[i]f the complaint filed against the insured avers facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover." Importantly, Pennsylvania adheres to the "four corners" rule (also known as the "eight corners" rule), under which an insurer's potential duty to defend is "determined solely by the allegations of the complaint in the [underlying] action." Under the four corners rule, a court in determining if there is coverage does not look outside the allegations of the underlying complaint or consider extrinsic evidence.
>
> To determine whether based on its factual allegations an underlying complaint triggers an insurer's duty to defend, a court views the allegations as true and "liberally construe[s them] in favor of the insured." An

> insurer must defend its insured until it becomes absolutely clear that there is no longer a possibility that the insurer owes its insured a defense. Thus, an insurer has a duty to defend if there is any possibility that its coverage has been triggered by allegations in the underlying complaint.

*Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673–74 (3d Cir. 2016) (citations and footnotes omitted, emphasis and brackets in original). The plaintiff bears the burden of establishing coverage under an insurance policy. *Butterfield v. Giuntoli*, 670 A.2d 646, 651–52 (Pa. Super. Ct. 1995). Only once coverage is established the insurer then bears the burden of proving that an exclusion applies. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 737 A.2d 100, 106 (Pa. 1999).

### C.   Analysis

In light of this foundation, we first look at whether the allegations in the Kesslers' complaint against Ms. Utegg established coverage under the Policy requiring State Farm to defend and indemnify Ms. Utegg. We reiterate that insurers owe an insured a duty to defend if there is any possibility that its coverage has been triggered by allegations in the underlying complaint. *Ramara, Inc.*, 814 F.3d at 674. Here, the Policy states that State Farm owes a defense for any suit brought against Ms. Utegg for damages because of bodily injury or property damage caused

by an "occurrence." Therefore, the plaintiffs bear the burden of establishing, at a minimum, that the Kesslers' allegations in the underlying action against Ms. Utegg concerned bodily injury or property damage caused by an "occurrence." Upon review of the Kesslers' complaint, we find that they do not, and thus, hold that State Farm owed no duty to defend or indemnify Ms. Utegg.

There is no dispute that the Kesslers' allegations do not concern a "bodily injury." The sole injury contained in the underlying action deals with the Kesslers' financial loss from the overall "cruel financial scheme." (Doc. 27-2, ¶ 1). Therefore, the main contention concerns whether the Kesslers' financial injuries can be considered "property damage" for purposes of their claim.

Under Pennsylvania law, insurance policy interpretation is a matter of law for the court. *See Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014). The "goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy." *Id.* (citing *401 Fourth Street., Inc. v. Investors Ins. Grp.*, 879 A.2d 16, 171 (Pa. 2005)); *see also Madison Constr. Co.v. Harlesville Mut. Ins. Co.*, 735 A.2d 100,

106 (Pa. 1999) ("The polestar of [the court's] inquiry … is the language of the insurance policy."). "When the language of an insurance policy is plain and unambiguous, [the] court is bound by that language." *St. John*, 106 A.3d at 14. "Alternatively, if an insurance policy contains an ambiguous term, 'the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage.'" *Id.* (quoting *401 Fourth St.*, 879 A.2d at 171.) "Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning." *Id.* (citing *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 978 (Pa. 2001)). "Finally, the language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety." *Id.* (citing *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997)); *Madison Constr. Co.*, 735 A.2d at 108 (observing the court "may inform [its] understanding of [insurance policy] terms by considering their dictionary definitions").

Here, the Policy defines "property damage" as "physical damage to or destruction of tangible property, including loss of use of this property." (Doc. 27-5). Courts in this Circuit have consistently emphasized that

- 14 -

property damage must be "tangible," which is "physical, capable of being touched and objectively perceivable." *U.S. Fid. & Guar. Co. v. Barron Indus., Inc.*, 809 F. Supp. 355, 360 (M.D. Pa. 1992). Property damage cannot be intangible property such as property that "represents value on its own (i.e. stock, investments, copyrights, promissory notes), property regarded as intangible rights (i.e. goodwill and reputation) and economic interests (i.e. overhead, profits, investment value and productivity.") *Id.* Here, the plaintiffs argue that Ms. Utegg suffered property damage as described under the terms of Ms. Utegg's Policy with State Farm when she suffered the loss of money. (Doc. 24, ¶ 22).

We previously found the only alleged loss of property in the Kesslers' underlying complaint concerned checks. *Utegg v. State Farm Fire & Cas. Co.*, No. 3:24-CV-02038, 2025 WL 2325747, at *5 (M.D. Pa. Aug. 12, 2025); *see* (Doc. 1-1, ¶ 51) ("At Utegg's explicit direction … the Kesslers then prepared personal checks…."); (Doc. 1-1, ¶ 53) ("At Bryan Utegg's direction, and as evidenced by the cancelled checks that the Kesslers have since obtained from their bank [], the Kesslers executed a total of eight (8) checks made payable to, and deposited by, 'HARC'…."); (Doc. 1-1, ¶ 54) ("At Bryan Utegg's direction, and as evidenced by the

cancelled checks that the Kesslers have since obtained from their bank [], the Kesslers executed a total of six (6) checks made payable to, and deposited by, 'OMIP'...."); (Doc. 1-1, ¶ 55) ("At Bryan Utegg's direction, and as evidenced by the cancelled checks that the Kesslers have since obtained from their bank [], the Kesslers executed a total of one (1) check made payable to, and deposited by, 'HVAC'...."). Moreover, we found that the Kesslers summarized that "[i]n each and every instance, Bryan Utegg picked up each check personally from the Kesslers and assured them he would place their funds in the new investments for their retirement." (Doc. 1-1, ¶ 56). But we explained that checks are not considered tangible property in the context of "property damage." *Utegg*, 2025 WL 2325747, at *5; *see R & L Zook, Inc. v. Pac. Indem. Co.*, No. CIV.A. 07-03774, 2008 WL 1931006, at *4 (E.D. Pa. May 1, 2008) ("A check is not 'tangible property' because it does not have intrinsic value."); *see also Pennsylvania State Emps. Credit Union v. Fifth Third Bank*, No. CIV. 1:CV-04-1554, 2005 WL 1154594, at *11 (M.D. Pa. May 3, 2005) (citing *Pagliarulo v. Nat'l Shawmut Bank of Boston*, 233 N.E.2d 213, 214 (Mass. 1968)) (rejecting a claim that a $33,000 cashier's check was tangible property since the check "is analogous to a promise to pay by the bank. It

is not a right against any specific $33,000 of the bank's assets. Its value is a right against the bank to receive its face amount."). Therefore, we found that the destruction of, or the loss of use of, checks cannot adequately serve as property damage of the kind that triggers State Farm's duty to defend under the Policy.

Here, the plaintiffs attempt to bypass our finding by arguing that the loss of *money*, rather than the loss of *checks*, constitutes "property damage" as defined under the terms of the Policy. (Doc. 24, ¶ 22) ("State Farm has an obligation to defend … which it refused to do despite 'loss of use of property'; i.e., the Kessler's loss of money); (*Id.*, ¶ 25) ("… the Third Amendment Complaint … alleges on its face property damage, loss of money…). But regardless of how artfully the plaintiffs draft their complaint, they cannot escape the fact that the underlying complaint for which they base their claims on specifically refers to the loss of *checks*, rather than money. *Matter of Est. of Larson*, 538 N.W.2d 802, 803 (Wis. Ct. App. 1995) ("Since bank deposits, *checks*, annuities and trust agreements are all agreements or documents conferring rights to the management and payment of money or assets, they fall within the definition of intangible personal property rather than tangible personal

property. They have no value by themselves, but rather *represent* value.") (emphasis added and included in original). Therefore, as we did before, we find that the Kesslers' complaint fails to allege any property damage that may fall within the Policy's coverage, and thus, State Farm had no duty to defend or indemnify Ms. Utegg in the underlying action.[2] We will grant State Farm's motion to dismiss on this count. We need not analyze State Farm's exclusion arguments.

Holding that State Farm owed no duty to Ms. Utegg under the Policy, we turn to the plaintiffs' statutory bad faith claim pursuant to Pa. Const. Stat. Ann. § 8371. The statute provides that:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take the following actions:
>
> (1) Award interest on the amount of the claim from

---

[2] To the extent that the defendants may argue that funds improperly withdrawn from their accounts via those checks constitute injury to or destruction of tangible property, this Court has rejected that position, holding that money wrongfully removed through debit-card transactions or forged checks does not meet that standard. *See Pennsylvania State Emps. Credit Union*, 2005 WL 1154594, at *11 ("While money, in certain contexts, could be considered tangible property and … capable of being destroyed … paying money out on forged checks [does not] constitute [] injury to or destruction of it as contemplated by the parties to the policy in question.") (quoting *Temco Metal Prod. Co. v. St. Paul Fire & Marine Ins. Co.*, 543 P.2d 1, 2 (Or. 1975)).

> the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. Ann. § 8371. Under Pennsylvania law,

> The term bad faith includes any frivolous or unfounded refusal to pay proceeds of a policy. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing) through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith. Therefore, in order to recover under a bad faith claim, a plaintiff must show (1) that the defendant did not have a reasonable basis for denying benefits under the policy; and (2) that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim.

*Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir. 2000) (citations and internal quotation marks omitted). "These two elements– absence of a reasonable basis for denying a claim under the policy and knowledge or reckless disregard of the lack of such reasonable basis– must be proven by clear and convincing evidence." *Cozzone v. AXA Equitable Life Ins. Soc. of the U.S.*, 858 F. Supp. 2d 452, 458 (M.D. Pa. 2012) (citing *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 3d Cir. 1997)).

In deciding whether an insurer had a reasonable basis for denying benefits, a court must examine what factors the insurer considered in evaluating the claim. *See Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688–89 (Pa. Super. Ct. 1994). "Bad faith claims are fact specific and depend on the conduct of the insurer vis à vis the insured." *Condlio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2000)). But we need not undertake a significant analysis in this case to determine whether State Farm acted in bad faith in its denial. We have already held that State Farm owed no duty to defend and indemnify Ms. Utegg in the underlying action, and thus, the mere fact that State Farm left Ms. Utegg "uncovered and undefended" and denied her claim (Doc. 1-1, ¶ 19) is not enough to sustain a claim of statutory bad faith; the plaintiffs must, at the very least, provide sufficient allegations that State Farm lacked a reasonable basis in denying those claims. *See Northwestern Mut. Life Ins. Co. v. Babayan*, 530 F.3d 121, 137 (3d Cir. 2005) ("The insured must ultimately show that the insurer breached its duty of good faith through some motive of self-interest or ill will.") (citations and quotations omitted). They have not done so here. For this reason, we will grant State Farm's motion to dismiss the plaintiffs' statutory bad faith claim.

- 20 -

- 21 -

Finally, we note that in light of the procedural history of this case, and in light of our findings in this memorandum, any further amendment appears to be futile.

## VI.  Conclusion

For the foregoing reasons, we will grant State Farm's motion to dismiss.

An appropriate order follows.

Dated: June 25, 2026                     *s/Joseph F. Saporito, Jr.*
                                         JOSEPH F. SAPORITO, JR.
                                         United States District Judge